Murphy and I got word of the recusal of the third panel member very late in the process. He and I kind of made the decision to go ahead with arguments since we had prepared the case, although he and I realize you have not been able to participate in that process. And we're both inclined to think that this is a very important case with someone facing a very long sentence, and that it ought to be heard by a three-judge panel. What I would propose is that you all, we set a time for you all to weigh in on that, whether you would prefer to have a third panel member hear the case, and then there would be a couple of ways to go about that. You know, the case would go back on the wheel, a third judge would be appointed, we don't know who that would be. And then they could either listen to the audio of the oral argument today, or we could have another oral argument, which I realize drags things out. But I just wanted to kind of put that out in public since this process of going from three judges to two happened really without any much involvement on our part, and none on your part. So I don't know if ten days, some sort of a letter brief, I don't know that it has to be long, but not more than ten pages about your views on that. You might change your mind after today. I don't want those to decide my case. But I apologize for kind of the fluid nature of this, but it's just what happens sometimes in courts. Having said that, are you all ready to proceed? Ms. Kingsley, we'll be happy to hear from you. Ms. Johnox, please. Meredith Kingsley on behalf of Appellant Erin Richardson. May it please the Court. Your Honors, this is a rare case for several reasons. One of those reasons is that although the facts are sensational, there's no real dispute about the facts here. It's the District Court's application of the law to those facts that we challenge. There are four points of error that we want to address today. First, the District Court's failure to adequately consider Mr. Richardson's long mental health history and condition on the evening that he was interrogated at the Jacksonville Sheriff's Office, and those statements were admitted in the trial court. Second, the misapplication of a two-level sentencing enhancement for obstruction of justice when none of Mr. Richardson's statements during the interrogation significantly obstructed or impeded the investigation into the attempted assassination of a federal judge. Third and fourth, the District Court erred by denying our Rule 29 motion for judgment of acquittal on two false statement counts. Count 10 related to the hypothetical presence of Mr. Richardson's DNA and fingerprints on a rifle found at the apartment in which he was located. And count 21, which relates to Mr. Richardson's accurate attestation of his compliance with conditions of his supervisory lease on December 30, 2012, the day before that he was arrested. One of the reasons that this is a rare case is because everyone involved, all of the government experts over years and years who looked at Mr. Richardson, the prosecution, the defense, and the magistrate judges who handled two phases of Mr. Richardson's criminal sentencing and treatment, agreed that Mr. Richardson was mentally ill. And specifically, Mr. Richardson, when he was not treated, has a condition— Here's the issue I have with your argument, which is that what you say may very well be true. In fact, let's assume it is true. The standard for invalidating a confession is whether or not there was coercion on the part of law enforcement. The court, the 11th Circuit that is, doesn't necessarily look to the mental state of the defendant. I think there'd be real problems if they did, but there just doesn't seem to be any coercive conduct by the police. And in fact, he agreed to speak. He just didn't sign the form. So, you know, how do you overcome 11th Circuit precedent to get the Miranda issue in front of us here? Your Honor, I'd like to address that in two parts. Starting with the last part of your question, we disagree and did raise at the district court level whether there was actually a valid Miranda waiver on the facts. If you view the video in totality and the advice of rights line of questioning, the last question when he was asked to whether he agreed to answer questions without a counsel present, we do not believe there was a valid waiver at that point. Setting that aside and addressing your other question, which is— I thought the video said he was read his rights. We agree with that, right? Yes, Your Honor. He acknowledged he understood all the rights, if I'm not mistaken. And then he said he'd answer the questions. And then he refused to sign the waiver. But, I mean, what—aside from having him sign the waiver, which I don't think is dispositive, what in the totality of the circumstances would defeat consent? Your Honor, the excerpts that were pulled that you're quoting that the government put in the record are a portion of a transcript or an engagement that went on for several minutes. When Mr. Richardson was asked whether he waived, it was not a direct affirmative answer or that he couldn't sign it, but he was willing to answer. There's a series in which he says—he puts a cup to his head and says he's going to fall out of his chair. He asks questions whether he can go home that day. So it's not as clear cut as it appears. And viewing that portion of the video specifically is very helpful on that point. But your question as to whether the defendant's mental state should be factored into the of his waiver, the answer is yes. There's a two-part standard. It has to be voluntary, and we don't dispute that there was no coercion here. We're not challenging the voluntariness of his statement within the Miranda analysis. We're challenging whether it was knowing and intelligent and believe that because of his mental state and how impaired he was on that day, he was not able to give a knowing and voluntary waiver, and therefore it was not a valid waiver. Did he get an evaluation prior to trial? Your Honor, he was not evaluated on that day. But yes, he spent two and a half years being evaluated, treated, and involuntarily medicated in the federal medical system before he went to trial. Was there any finding that he was of such limited mental state that he couldn't volunteer to answer questions properly? Your Honor, there were findings made about his engagement and his ability to understand and answer questions that were posed to him by the mental health professionals that were engaged with him. He was not specifically evaluated in a Miranda-type analysis. However, he was evaluated whether he was competent to understand the proceedings against him and to assist his counsel. Consistently, every time he was evaluated, when he was not medicated, he was finding that he could not do those things. He could not understand the proceedings against him, and he could not assist his counsel. And so, it is unbelievable to imagine that at a time when he was not medicated, he was interrogated at a sheriff's office without counsel with him. I don't recall the evidence of whether or not he was medicated when he was being interrogated by the police. He was not medicated when he was being interrogated by the police. How do we know that? We know that because he had a prior engagement with the criminal justice system for which he was actually arrested on June 25th that led to the interrogation. There is a mental health history and a long documented history there of evaluation and treatment by medical professionals. In that instance, just like in Phase 2, the post-arrest mental health treatment, he was found to be incompetent. He was provided involuntarily medication and then brought to be competent, sentenced to time served, and allowed out on supervised release. During that time in supervised release, he stopped medicating himself. And he was evaluated most recently in May of 2013 before his arrest in June by a private practitioner that noted that he was deteriorating because of the fact that he was not taking any medication at the time. So all of that evidence was in the record and it was before the magistrate judge when he decided to not suppress the statements that day. Ms. Kingsley, so as I understand it, the competency hearing was held before Judge Graham on November 30th and then the next day was the suppression hearing before the same judge, right? Yes, Your Honor. So did anybody talk about the mental health issues in the suppression hearing? During the suppression hearing, trial counsel asked questions of the investigating agents as to what they knew about the defendant's mental health state at the time. But there was no argument after that on the suppression issue at all. So the evidence was put into the record. All the evidence of the mental health state was before the magistrate judge. The video was before the magistrate judge. All of those things were on the record and there was actually no argument that day on the motion to suppress. Who has the burden of showing that Mr. Richardson was competent to knowingly waive his Miranda rights? It's the government's burden. And the government put forth no evidence to contradict every single bit of evidence in the record that everyone involved in the trial and even everyone involved in Mr. Richardson's criminal proceedings prior to this arrest, that it was consistently found that he was not competent and able to assist when he was not medicated. The government did not bring any of its own experts. The government didn't have any evidence at all contradicting the significant weight that he had suffered from this mental defect. And in fact, throughout the two and a half years after his arrest leading up to that a number of times that he was suffering from that. The reason that the competency hearing that you referenced was delayed until November 30th of 2015 is because it was identified leading up to the suppression hearing and other evidentiary issue hearing that he had not been given his medication. And so as soon as that was identified, the U.S. Attorney's Office called the judge and it was determined that we should push the suppression hearing and have another competency hearing after he was administered his medication and there was testimony from medical professionals. It could not be clearer on the record and could not be more at the forefront of everyone's mind going into the suppression hearing that there were serious mental issues that were not addressed. So I have a practical question. Which conviction, if any, would fall if you prevailed on that argument? The statement should have been suppressed. Your Honor, the specific statements that were charged as false statements in that interrogation are counts five through ten. So that's six counts that are directly impacted. It is hard to say the effect of the admission of those statements on the other counts and the effect of those admitted statements throughout the trial. But certainly those six would need to be reversed if the statements were suppressed. I see I've passed my time. Thank you. Mr. Rhodes, good morning. Good morning. Thank you, Your Honor. May it please the Court. David Rhodes for the United States. On this Miranda issue, let me first point out it is only counts five through ten that are affected by this or that potentially could be affected by this Miranda issue. What effect would that have on this sentence? On his sentence? The defendant received consecutive sentences, the maximum consecutive sentence for each count. So if those, and I hate to even talk about this, but I understand if those counts were vacated, the sentences on those counts would have to be vacated as well. As a practical matter, it would have no effect on the defendant's sentence because he has a duration that is longer than his life regardless. But it would require a change to his term of years. Thank you. Okay. So going back to . . . Oh, actually, I do have one more question about that. So even if they, you know, were, we've suppressed those statements or say the statement should have been suppressed. Couldn't the district court still consider all of that as relevant conduct in a resentencing? The court could consider it as relevant conduct. But since the defendant got the statutory maximum, it wouldn't be able to go up as high as it did because if these counts of convictions were removed, his statutory maximum sentence would be less. So the available, the permissible sentence would be six offenses less than what he got. Okay. Anyway, so back to the issue. The defendant did waive his Miranda rights. We'll start with that because the defendant is still asserting that he didn't. He didn't say after the rights were read to him, he acknowledged and agreed with each right. I understand it. Yes, yes, yes. And they said, do you agree to waive your rights? And that's where he didn't actually say, yes, I do. That's where he said a few other things. He said that, instead, I'm going to look you in the eyes. I'm going to shake your hand. That's how I get a bond with you. And then he starts answering questions. And as long as he waives that right by answering questions, he never said, no, I'm not going to talk to you. No, I want a lawyer. He waited until they finished. Then he started answering questions. And obviously, he did that for a lengthy period of time. I get the sense, well, from my reading, I think you're absolutely correct on the facts. But I get the sense from argument today that there's a subtlety here, which is that, yes, everything you say is true, Mr. Rhodes. However, he was off his meds. He was mentally ill. And the decisions he made to do those things were involuntary and affected by his illness and therefore couldn't have supported a knowing, voluntary, intelligent waiver. Okay. So let me address that. The voluntariness of it, there's no evidence of any coercion whatsoever. And his mental health issues is not going to, cannot by itself change that fact. Okay. Then you get into knowing and intelligent waiver, the last part of the inquiry here. And could that have effect on it? Yes, it could have an effect on it, certainly. Different people have different degrees of competency, different degrees of understanding. It's no different than people with different degrees of experience with the criminal justice system, different degrees of education, different ages. They all have different experiences that go into the district court's determination of whether somebody has knowingly, intelligently waived their rights. So that's what we have here. But this is how it was litigated. The motion that the defendant filed didn't, it was just a plain motion asking for a Jackson v. Deno hearing on his waiver of his Miranda rights, which is fine. No mention of mental health issues there at all. Then we have the hearing. But you did have this dynamic where everybody in the courtroom for the suppression hearing had been there just the day before, spending the day on the competency issues. Right. I understand. Right. Right. I mean, everybody was aware of this. I'm not questioning that at all, Your Honor. This had been an undercurrent, at least in terms of his competency to stand trial. That's what they were dealing with. And he'd been through a lot. And in that regard, Ms. Kingsley just gave us a rundown of how everyone knew that he was not taking his meds. I mean, did she say that right? Or do you see that differently? I think it's a fair reading of the record that he had stopped taking his meds. Dr. Palm, who had been treating him earlier in 2011, while he was out on supervised release from his first conviction, he had weaned him off of his medication. And there is, if you look through the reports, the November 29th report of Dr. Feldman, I think it is, he explains that history. So he had been weaned off of them. But he'd been weaned off of them in retrospect, perhaps too hastily. But Dr. Palm had decided he was proceeding, and he weaned him off of those medications. That's in 2011. Then this event, the interview that took place, is in June of 2013. So what do we have at that point in time? We don't have anybody ever opining on whether this defendant was capable of understanding the Miranda warnings and understand the consequences of waiving them. That's what knowing and intelligence means under Miranda. Those rights. All that anybody had looked at. And I'm not trying to trivialize those rights. Those obviously are extremely important. But at the same time, it's not the most complicated decision in the world for you to do that. Especially somebody, he'd been to college, he'd been in the criminal justice system. To understand that is one thing. What had been done previously, and at this point, at the time of that interview, it was two years earlier, in conjunction with his previous conviction, he had been deemed incompetent to stand trial. Now that, of course, is a very different and much more complicated thing. He has to understand the nature of the charges. He has to understand the proceedings, which are very complicated in a federal criminal case. And he has to have the ability to assist his counsel in his defense. So at some point, a few years earlier, he was deemed unable to do that. And then we have- Now, wait a minute. Was that in a different case, or was that- Yes, Your Honor. That was in relation to his underlying case, the 2008 case, that originally brought him before Judge Corrigan. Right. Okay? So he goes through that. He's medicated, becomes competent, pleads guilty, is sentenced by Judge Corrigan to time served. Then he starts serving his supervised release. He's seeing Dr. Palm. Dr. Palm weans him off of his medicine. And then we have this interview that takes place in June of 2013. And so we're talking about a lengthy period of time after that, number one. Two, we're talking about a much more limited degree of competency needed there. And three- For the Miranda warnings. For the Miranda warnings, yes, Your Honor. And three, the next thing we have after the interrogation that takes place in the Sheriff's is he is down. If you look at Dr. Feldman's November report, the defendant is incarcerated then because of his previous case at that point. And the doctor there, Dr. Wenzel, that is in November of 2013. That's the first evaluation that is completed of the defendant after this interview takes place. She found him competent to understand there was a disciplinary proceeding in jail down there. And she found him competent to understand the disciplinary proceedings and dealing with that. And again, I would say that's a more complex situation than a waiver of Miranda rights. And I would say it's less complicated than being competent to stand trial. But in any event, that's the first decision that was made after the interview was given here. So all of this, I guess what I'm saying is all of this is before the court knows what had happened at the time and knew that he subsequently was deemed incompetent to stand trial. And you ask, Your Honor, well, is that my burden? That is our burden to show by a preponderance of the evidence that he knowingly and intelligently waived his right. And that is what the district court found. Now, once . . . So when you say, on the one hand, nobody talked about it at the suppression hearing, and then on the other hand, it's my burden to show that he was competent, that's where that argument comes from. Right. But we don't have to reject something or we don't have to avoid something that is not, I wouldn't, I would say it wasn't even particularly in play at the hearing because there was no mention of it at the hearing other than asking the . . . And I understand it's still our burden, but I'm just sort of explaining . . . Yeah, so that's her argument. Right. If it wasn't mentioned, it was your burden and . . . Well, we had to prove by a preponderance of the evidence that he knowingly and intelligently waived it. And you can see that from watching the video, his responses. You can see it from what the agents say. He wasn't on any pain medications at that point. He seemed lucid. You can get it, I would say, most significantly from the defendant's answers throughout this entire period because this issue arises most often when a defendant ends up confessing when he goes through this. And one could say, I mean, there are a variety of reasons the defendant confesses, some good, some bad, but there's at least a question, why would you confess to that? Why would you admit to that? That's not what we have here. We have a defendant who went out of his way to invent exculpatory explanations for every single thing that had happened and something . . . You said something interesting, which is that, and we all agree, we can tell we all agree, that the government has the burden to show knowing, voluntary, intelligent waiver of the right, that you said, among other things, he wasn't on pain medications, etc. I assume the assistant United States attorney at the suppression hearing had no notice that three years later, you were going to be here in Atlanta arguing about whether or not the absence of medications affected the . . . You know what I'm saying? Right. Right. So what you have is you sort of explain the situation there, and you see sometimes where you have . . . I'm not so interested in the facts as I am in the legal standard. I mean, does the fact that you didn't show that he was a mentally ill person who wasn't taking his meds, I mean, is that something that the U.S. Attorney's Office would have been required to show at a suppression hearing? No, Your Honor, but let me get back to the suppression hearing, because although it wasn't from the defendant asking the agents, were you aware of his mental health history at the time you were questioning him? And that sometimes is relevant if you know of a defendant has certain susceptibilities, sometimes an agent can take advantage of those things. But that's about volunteering. Exactly, Your Honor. Exactly. So that was all that came up then. But nonetheless, we have a report and recommendation from the magistrate judge at the And it was after that that the mental health issue came to light again, because in the defendant's objections to the report and recommendation, he went through all of the things, all of his history, explained, I have these incompetency issues, which as I've explained, don't really answer the question. They certainly don't avoid the district court's ability to find otherwise from what it had before him. But nonetheless, in our response to the objections, we explained that this is a different issue. It was at a different time. And look at what they had before them. Look at how the defendant was acting. This is your factual finding, notwithstanding that he had a history of mental health issues, which no one is disputing. That doesn't work. And this is really where this comes down to. That does not require you to find, Your Honor, that he was incapable of knowingly and intelligently. Because by asking you to reverse the district court's finding, that's in essence what the defendant is saying, that he couldn't find, based on everything he heard and everything he saw, that this defendant knowingly and intelligently. And I suggest to you that based on the defendant's actions that day, particularly his responses to the questions, the fact that he seemed lucid, the fact that he wasn't on pain medications, et cetera, et cetera, fully supported the district court's finding. And it could be different if we had had a psychologist who testified that at that time, because of his mental health issues, he was incapable of knowingly, understanding his Miranda rights. But no one has ever said that there was ever a time when he was incapable of understanding his Miranda rights. May I? I know your time is up, but before you sit down, I wanted you to respond to Ms. Kingsley's about the obstruction counts, that the statements that he made were so off base that they couldn't have possibly had the capacity to affect the investigation. Okay, that's the enhancement, the 3C1.1 Enhancement for Obstruction of Justice, based essentially on these same statements that the defendant made. And that enhancement applies if a defendant attempts to obstruct the administration of justice with respect to the count of conviction. These statements were all an attempt to do that. I mean, they all related to the attempted murder of Judge Corrigan. They were his attempt to create an alibi. The statements could not have been more material because they went directly to the heart of the crime. Now, whether they believed him, that's beside the point. It does not matter. The law is clear. We cited in our brief that the fact that they knew, although they didn't know that much at the time, right at the time they made it, because this was very early in the investigation. I thought there were two things going on here. I thought that number one, the defendant was convicted of two counts of making false statements at trial, right? And my understanding is that what you're talking about now is a two-level enhancement under 3E that there was an obstruction of justice by making the false statements. Right. Well, I'm trying to keep these things from bleeding over because I guess my question to you would be, forget about the conviction, if the judge found obstruction of justice based on the statements, is that enough to enhance a sentence? You understand my question? The guy makes these statements, right? Right. So assuming there was not a conviction for those false statements? Just put that aside. Okay. Right? Is it, as a matter of law, appropriate to enhance the sentence because the statements he made had the government have to track down additional leads, get on the wrong path, create an alibi, all these sorts of things? I think in the absence of those, absent of those conditions, and if you look at note four and five to 3C1.1, they say if the defendant has a count of conviction for the obstruction, the enhancement applies. So if we set aside those convictions with respect to these statements to the police officers, which were unsworn, we would have to show that it substantially impeded the investigation. That's what we would have to do to rely on those. Now, recall, we also relied on other obstructive conduct of the defendants to support that enhancement. He made two false statements to the probation officer. He had the forged order that he entered, and twice he failed to appear at hearings. And those alone would justify this enhancement. The probation officer, in the addendum to the pre-sentence report, points those things out. Let's change the question, then. As I read the transcript, I believe the district judge actually relied on the convictions of the two counts. And so the jury found, as a matter of fact, that these were false statements. So that amounts to obstruction of justice as well under the guideline enhancement application notes, correct? Correct. It would. If you look at note four and note five, make it very clear that if you have the count of conviction, the jury finds that, then you don't go any further than that. And that's a mechanism, even if you look at note eight, where they talk about the grouping rules, that's a mechanism to ensure that there is some effect. In this case, it doesn't really have much effect. But in an ordinary case, you want to make sure that a defendant's obstructive conduct, especially conduct that results in a conviction, has some effect. Because it adds something to the underlying offense, that it has some effect on the defendant's guideline range. And that's what that is designed to do. And that's what we have here because— I'm sorry to both you and the Court that I've taken up so much time on this. But I just have to ask one final question, which is that the defendant seems to argue the—and this came up earlier—if you're in the courtroom, that the statements were so preposterous that they seem to be immaterial and nothing that a rational law enforcement officer could have possibly relied on. I mean— Well, what I'll say to that is, I don't think that's relevant to the materiality for purposes of the enhancement. It just has to be something—the materiality there is something that would be the type of thing that could affect this. So you think of what's material. If he's denying having touched the rifle, that's material to the offense. If he denied leaving his house, he said he was home sick during those days, those are prototypical material statements because they go directly to the heart of the matter. So if he had said—if his lie had not been that I went to Tijuana Flats and got sick and it turned out, no, he wasn't there, he was at Chipotle and got sick, that would not be a material false statement, obviously. But when here, when he said, I got sick, I was home, I wasn't anywhere else during the time when these acts took place, that goes right to the heart of the offensive conviction in his material. Thank you. Thank you. Your Honor, it seems that there are two big issues that were addressed by the government that I'd like to address here. I'll start and take us back to the suppression issue briefly. I want to be clear that—and to answer your question, Judge Murphy, about the AUSA at the time thinking ahead to where we stand today. Right. Right? Right. The AUSA at the time—let's go back to the fall of 2015—learned that Mr. Richardson was not being medicated as prescribed at the jail where he was being housed, leading up to the suppression hearing and other evidentiary hearings and then the trial in this case. That concerned the AUSA so much that he immediately called the judge and called us and said, we have to stop. We have to get him evaluated. We have to get him back on his medication. We need another competency hearing. He had already been deemed competent based on the application of his medication. We need another hearing before we can go forward. Yes, that was something at the forefront of the AUSA's mind, the judge's mind, and everyone's mind at the time. So it's really disingenuous, I think, for the government to say otherwise, given that it was such a big issue leading into the trial. I don't know they're saying otherwise, and I don't disagree with your statement. I guess what I'm trying to figure out is if it's the government's burden to prove is a legal matter, knowing intentionality and voluntariness, how many roads do they have to close off? Do they have to show, specifically in this case, that his absence of medication and his behavior at the time of interrogation would render his confession and his statements involuntary or unknowing or unintentional? They didn't close off any roads. They didn't put on any evidence. They showed that he wasn't on pain medication. They showed that he was lucid. They showed the things you would normally show to support the voluntariness and knowingness of a confession. The only thing that they showed, Your Honor, is a video of the interrogation. They did not offer any sort of evidence as to why any of the stipulated evidence, any of the seven years of medical reports saying that when Mr. Richardson was not involuntarily medicated, that he wasn't competent. There was no evidence presented by the government. It is their burden. And I will go so far as to say that the problem presented itself in the R&R because it's not referenced at all. There is no reference to the defendant's mental health state. The only part of the Miranda test that is analyzed is the voluntariness. And so we have no way of knowing whether the court did what, you know, did any weighing at all or any evaluation of the evidence of the interrogation from the video. That's when we directly responded to it and the objection to the R&R. And then the district court judge didn't address it either, said that he reviewed all the evidence de novo and then made a finding adopting the R&R. We have no reason to believe, and it's very hard to refute, what the lower court did because there's no evidence that they considered seven years of mental health treatment at all in coming to their decision on suppression. I'd like to respond to the 3C1.1 issue in my remaining minute. I want to respond to the court's question about the absurdity of the statements that were made and whether that impacts the materiality analysis for the enhancement. It is a different standard under 1001, a materiality standard, than it is in 3C1.1. And so it does matter that the statements that he made were so absurd that they could not have swayed or impacted the finest team of FBI and investigating agents that the country could put together for the assassination of a federal judge. It makes a difference for the guidelines analysis. It does for the enhancement. Correct. Yes, Your Honor. So I wanted to address that point specifically. Thank you. Thank you. I said this was an important case and I think the advocacy, we are well served by it. So I compliment counsel on both sides and I know you're appointed, Ms. Kingsley, and thank you and your firm for doing this work. And we'll wait to hear from you all. I think Judge Murphy and I feel like we would feel better if there was a third judge, but we welcome your thoughts in that regard. Court is concluded.